

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

LORI L. ENGLAND,

        Appellant-Respondent,

v.

JESSE W. ENGLAND,

        Respondent-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

**WD77209**
**(Consolidated with WD77230)**

**OPINION FILED:**
**February 24, 2015**

### Appeal from the Circuit Court of Platte County, Missouri
### The Honorable James W. Van Amburg, Judge

**Before Division Two:** Anthony Rex Gabbert, Presiding Judge, and
Joseph M. Ellis and Karen King Mitchell, Judges

Jesse and Lori England, formerly husband and wife, cross-appeal various portions of the

trial court's distribution of marital assets in its judgment of dissolution. Finding no error, we

affirm.

## Facts[1]

Husband and Wife were married in 2003. At that time, they lived in a house in Omaha,

Nebraska, that Husband owned before the marriage. In 2005, they moved to St. Joseph,

---

[1] "'We view the evidence and all permissible inferences in the light most favorable to the judgment and disregard all contrary evidence and inferences.'" *Sparks v. Sparks*, 417 S.W.3d 269, 276 n.1 (Mo. App. W.D. 2013) (quoting *Querry v. Querry*, 382 S.W.3d 922, 926 (Mo. App. W.D. 2012)).

Missouri, where they purchased a home. In August 2012, Wife moved out of the marital home and filed for divorce.

Husband's mother, Alice Longfellow (Mother), made a number of gifts to Husband, Wife, or both. Three of these purported gifts are at issue in this case.

Before the marriage, Mother gave Husband a gift of $50,000. Husband testified at trial that some of this money "went to . . . [his] education when [he] went back to school," before the marriage. Husband did not offer any evidence of the amount of the gift remaining, if anything, at the time of the marriage.

Also before the marriage, Mother purchased a motor vehicle for Husband. Husband testified that Mother initially offered to purchase a much more expensive vehicle, but that he chose, instead, to receive a less expensive vehicle and, in return, Mother agreed to give him money to also purchase a motorcycle. However, no motorcycle was purchased before the marriage. Instead, Husband purchased a Harley Davidson motorcycle during the marriage. Husband offered an exhibit estimating the motorcycle's value at the time of trial as between $7,000 and $8,000, along with a bill of sale from 2003 showing a price of $22,000 and "Jesse W. England" as the purchaser. Husband implied that Mother purchased the motorcycle for him, testifying that he was unemployed at the time of the purchase and that "unemployed people typically don't have the ability to pay $22,000" for a motorcycle.

During the marriage, while Husband and Wife were visiting Mother in Texas, Mother told Husband that she would like to give him a gift of $115,000. A few days later, when Mother was dropping Husband and Wife off at the airport, Mother asked Husband for his bank account number so that she could wire the money. Husband did not have his checkbook, but Wife wrote down and handed Mother the account number for the couple's joint account. Mother believed

that this number was for Husband's sole account. Mother wired the money to the account number given to her by Wife after Mother verified the account number with Husband.

Husband then transferred $100,000 from the joint account to his personal account. This action was taken over a number of days in a series of $10,000 transfers, because of Husband's belief that federal law required "going through a lot of hoops" for transactions totaling over $10,000 per day. The remaining $15,000 was used to pay off a large credit card bill. Wife did not protest any of these transactions.

There was an issue regarding alleged debts for work done at the couple's home during the marriage. Husband testified that, during the marriage, three contractors performed work on the couple's St. Joseph property for which the couple had been billed, but had not made payment. Husband testified that Wife knew of and approved of each of the projects, costing a total of $78,473.

In late 2011 and early 2012, Woods Contracting hauled crushed concrete, black dirt, fill rock, and gravel (fill) onto the couple's property to fill in eroded areas on a dam separating two ponds. Gerald Woods, owner of Woods Contracting, testified that the fill was made up of remnants from other jobs, which would have been disposed of had it not been used on the England property. Husband also offered two invoices from Woods Contracting, dated June 30 and July 31, 2012, totaling $55,435 for the materials, as well as equipment rental and the time of an equipment operator. Husband also offered a collection letter from Woods Contracting, dated May 17, 2013, in which Woods stated that the Englands' "account is grossly overdue despite numerous notices we have sent you in the past several months." Woods was unable to locate any such notices, or testify as to when or whether any notices were actually sent.

3

Husband next testified that Jerry Kamler worked on farm equipment, as well as some buildings, on the Englands' property during the marriage, for which Kamler was due compensation. Kamler testified that he worked on the property nearly every weekend from April through July of 2012, often working with Husband on various equipment and projects. Husband offered fifteen invoices from Kamler, totaling $15,915. Husband also offered a collection letter from Kamler, dated May 3, 2013, demanding payment of $16,122 for "the past due invoices including late fees and interest."

Finally, Husband testified that there was a shed on the couple's property in which he did work on farm machinery. Husband testified that, because the shed did not have electricity, he hired Leonies Enterprises to install electricity and lighting. Husband offered an invoice from Leonies Enterprises, dated June 5, 2012, showing a balance due of $6,500.

The parties also disputed whether a dog acquired during the marriage was Husband's sole property or the property of both Husband and Wife. In 2009, a dog that Husband had owned since before the marriage passed away. Husband's father, Gerald England (Father), was formerly married to a dog breeder, who had a puppy that was too small to sell. Father and his ex-wife decided to offer the puppy to replace the one that had passed away. Wife received the call from them and she indicated that she wanted the dog, but would check with Husband to be sure that he thought they should take it. Husband then called Father and accepted the dog. Father and his ex-wife drove from Oklahoma to St. Joseph to deliver the puppy to the couple's home. Father testified that "as far as [he] kn[e]w," the puppy was meant as a gift from his "ex-wife to [Husband] and [Husband] only . . . ."

Following a three-day trial, the court issued its findings of fact, conclusions of law, and judgment dissolving the marriage and distributing the marital assets. The court found the

4

testimony of Kamler and Woods, regarding alleged marital debts, "to be incredible," and further found that there was "no credible evidence to support the claim of" any of the debts at issue in this case. The court did not include the $78,473 alleged marital debt in the distribution of assets. The court found the $115,000 gift from Mother to Husband to be non-marital, and set it "aside to [Husband] as his non-marital property." The $50,000 pre-marital gift from Mother to Husband was found to be fully dissipated by the time of the marriage. The court found the motorcycle to be marital property and set it aside to Husband, but included the value of the motorcycle in the calculation of the property division. The court awarded the dog to Wife. The parties timely filed cross-appeals.

## Standard of Review

In a judge-tried case, the "judgment of the trial court will be sustained . . . unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

"Substantial evidence is evidence that, if believed, has some probative force on each fact that is necessary to sustain the circuit court's judgment." *Ivie v. Smith*, 439 S.W.3d 189, 199 (Mo. banc 2014). "Evidence has probative force if it has any tendency to make a material fact more or less likely." *Id.* "When reviewing whether the circuit court's judgment is supported by substantial evidence, appellate courts view the evidence in the light most favorable to the circuit court's judgment and defer to the circuit court's credibility determinations." *Id.* at 200. "'[A]n appellate court will accept as true the evidence and inferences from the evidence that are favorable to the trial court's decree and disregard all contrary evidence.'" *Zweig v. Metro. St. Louis Sewer Dist.*, 412 S.W.3d 223, 231 (Mo. banc 2013) (quoting *Sch. Dist. of Kansas City*

5

*v. State*, 317 S.W.3d 599, 604 (Mo. banc 2010)). "[N]o contrary evidence need be considered on a substantial-evidence challenge . . . ." *Ivie*, 439 S.W.3d at 200.

On the other hand, "'[a] claim that the judgment is against the weight of the evidence presupposes that there is sufficient evidence to support the judgment.'" *Id*. at 205 (quoting *In re J.A.R.*, 426 S.W.3d 624, 630 (Mo. banc 2014)). "The against-the-weight-of-the-evidence standard serves only as a check on a circuit court's potential abuse of power in weighing the evidence, and an appellate court will reverse only in rare cases, when it has a firm belief that the decree or judgment is wrong." *Id*. at 206. When reviewing a challenge that the judgment is against the weight of the evidence, appellate courts defer to the circuit court's findings of fact when the factual issues are contested and depend on credibility determinations. *Id*. "A circuit court's judgment is against the weight of the evidence only if the circuit court could not have reasonably found, from the record at trial, the existence of a fact that is necessary to sustain the judgment." *Id*. "When the evidence poses two reasonable but different conclusions, appellate courts must defer to the circuit court's assessment of that evidence." *Id*. "Circuit courts are free to believe any, all, or none of the evidence presented at trial." *Id*. at 200.

**Analysis**

Wife challenges only the trial court's finding that the $115,000 gift from Mother was Husband's separate property. Husband appeals four of the trial court's rulings: (1) the award of the dog to Wife as marital property; (2) the exclusion from the marital estate of debts allegedly incurred in improving the couple's property; (3) the determination that Husband's motorcycle was a marital asset; and (4) the determination that a pre-marital gift of $50,000 to Husband from Mother was completely dissipated at the time of marriage.

6

*Wife's Point*

Wife argues that the trial court erred in finding that Mother's gift of $115,000 was non-marital[2] because "money held in joint accounts is conclusively marital in Missouri." Wife argues that the wire transfer "was clearly a gift to both spouses."

Under Missouri law, "[a]ll property acquired by either spouse subsequent to the marriage and prior to a decree of legal separation or dissolution of marriage is presumed to be marital property regardless of whether title is held individually or by the spouses in some form of co-ownership." § 452.330.3.[3] But this presumption is overcome if the spouse can show by clear and convincing evidence that the property was "acquired by gift." § 452.330.2(1); *see Binder v. Thorne-Binder*, 186 S.W.3d 864, 870 (Mo. App. W.D. 2006) ("Clear and convincing evidence must be shown in order to defeat the presumption that property acquired after the marriage is marital."). The statute "does not establish a category of gift separate from the common law inter vivos gift," *In re Marriage of Johnson*, 856 S.W.2d 921, 926 (Mo. App. S.D. 1993), the elements of which "are the donor's present donative intent, delivery, and acceptance by the donee whose ownership takes effect immediately and absolutely." *Koger v. Koger*, 345 S.W.3d 330, 331 n.4 (Mo. App. S.D. 2011). "When the issue is classification under § 452.330 of property allegedly acquired by gift, whether or not there was a valid inter vivos gift is a question of fact." *Johnson*, 856 S.W.2d at 927.

Here, the donor of the money, Mother, testified that she told Husband that she intended to give a gift to him, that she listed only Husband's name on the wire transfer documents, and that

---

[2] Husband argues that the trial court made no such finding, and that Wife is really challenging the court's failure to make a finding, which was not properly preserved by post-trial motion as required by Rule 78.07(c). Contrary to Husband's assertion, the trial court specifically found "the testimony of [Mother] . . . to be credible," and "set aside [the gift] to [Husband] as his non-marital property."

[3] All statutory citation is to the Revised Statutes of Missouri as updated through the most recent supplement.

she did not know that the account was jointly held and would not have initiated the transfer had she known. The trial court specifically found this testimony to be credible.

Wife argues that, despite Mother's intent to make a gift to Husband, "Husband's intervention in the transfer of funds worked to make the gift marital." Wife notes that, days after Wife presented Mother with the parties' joint account, Husband confirmed that account number with Mother. And after the gift was wired to the joint account, Husband did not transfer the money to his account for several days.

"These arguments simply overlook the requirement that we view the evidence in the light most favorable to the judgment and defer to the trial court's determination of the credibility of witnesses and the proper weight to accord their testimony." *Flora v. Flora*, 426 S.W.3d 730, 739 (Mo. App. S.D. 2014). Our deference to the trial court's factual determination "includes facts expressly found in the written judgment or necessarily deemed found in accordance with the result reached." *Ivie*, 439 S.W.3d at 206.

Husband testified that he transferred the money to his personal account as quickly as he thought federal law allowed without requiring him to "jump through hoops" and that Wife did not protest when he transferred this large sum to his separate account. The trial court could have found otherwise, but the facts support a finding that the couple knew that the gift was to Husband alone and that they treated it as such.[4]

---

[4] Wife also argues that Husband's actions in allowing the money to be transferred into the couple's joint account transmuted the gift into marital property. Husband claims that this argument was not properly preserved because Wife never presented it to the trial court. We agree. *Lincoln Credit Co. v. Peach*, 636 S.W.2d 31, 36 (Mo. banc 1982) (appellate courts "will not, on review, convict a lower court of error on an issue which was not put before it to decide"). But even if it was presented, there is sufficient evidence in the record to support a finding that the money was not transmuted. *Moore v. Moore*, 189 S.W.3d 627, 638 (Mo. App. W.D. 2006) (Where funds were placed into couple's joint account and then promptly removed, "commingling was incidental and did not result in transmutation of the funds . . . into marital property.").

The trial court did not commit error in finding that the gift from Mother was Husband's non-marital property. Wife's point is denied.

### Husband's Points

As an initial matter, it is clear that Husband misunderstands both the trial court's role in receiving and weighing evidence and our standard of review on appeal. Husband repeatedly asserts that he has proved a "prima facie case" and argues that Wife must then provide evidence to rebut his evidence. Husband argues that, where he has provided evidence, such as testimony or written evidence, and Wife failed to offer her own direct evidence, the trial court was bound to hold in his favor. This misstates settled Missouri law.

"When the burden of proof is placed on a party for a claim that is denied, the trier of fact has the right to believe or disbelieve that party's uncontradicted or uncontroverted evidence." *White v. Dir. of Revenue*, 321 S.W.3d 298, 305 (Mo. banc 2010). "If the trier of fact does not believe the evidence of the party bearing the burden, it properly can find for the other party." *Id.* "'Generally, the party not having the burden of proof on an issue need not offer any evidence concerning it.'" *Id.* (quoting *Stiff v. Stiff*, 989 S.W.2d 623, 628 (Mo. App. S.D. 1999)).

"It is only when the evidence is *uncontested* that no deference is given to the trial court's findings." *Id*. at 308.

> Evidence is uncontested in a court-tried civil case when the issue before the trial court involves only stipulated facts and does not involve resolution by the trial court of contested testimony; in that circumstance, the only question before the appellate court is whether the trial court drew the proper legal conclusions from the facts stipulated.

*Id*.

Contrary to Husband's assertion, "[t]o contest evidence, a party need not present contradictory or contrary evidence." *Id*. A party might contest evidence by presenting evidence

9

to the contrary. But a party might also contest evidence by, for example, cross-examination, pointing out internal inconsistencies in the evidence, or arguing to the trial court that the witness is not credible as is apparent from the witness's demeanor, bias, or incentive to lie. *Id.*

"When evidence is contested by disputing a fact in any manner, [an appellate c]ourt defers to the trial court's determination of credibility." *Id.* Again, the trial court is "free to believe any, all, or none of the evidence offered to prove a contested fact." *Ivie*, 439 S.W.3d at 206. And on direct review, "the appellate court confines itself to determining whether substantial evidence exists to support the trial court's judgment; whether the judgment is against the weight of the evidence—'weight' denoting probative value and not the quantity of evidence; or whether the trial court erroneously declared or misapplied the law." *White*, 321 S.W.3d at 309.

Having set forth the correct standard of review, we turn now to Husband's points of error.

*Point I – The gift of the dog*

Husband argues that the trial court erred both in finding that a dog given as a gift by his former stepmother during the marriage was marital property and in awarding it to Wife. Husband argues that, because the "donor" of the dog offered "more than conclusory statements" that the dog was meant as a gift to Husband, then the trial court was bound to award the dog to Husband. This argument misstates both the law and the record.

Despite Husband's repeated reference to Father as the "donor," the only testimony from Father is that the dog was a gift "[f]rom [his] ex-wife." Further, Father did not even provide direct testimony that he knew that the dog was meant as a gift solely to Husband. Rather, Father testified that, "as far as [he] kn[e]w," his ex-wife, who was deceased at the time of trial, meant

10

for the dog to be a gift to Husband. And even if Father's testimony had been clear that he was the donor and intended to make a gift to Husband, the trial court was free to disbelieve him.

Husband next cites *In re Marriage of Johnson*, 856 S.W.2d 921, 927 (Mo. App. S.D. 1993), for the proposition that, if the donor offers "more than conclusory statements" that he had "the intention to make the [dog] a gift to one spouse," then "this Court must reverse the trial court's judgment and order the [dog] set aside to [Husband] as his separate, non-marital property." This misstates the holding in *Johnson*.

In *Johnson*, the owners of the company for which the husband worked gave him shares of stock in the company. 856 S.W.2d at 924. The company's accountant and owner testified that the shares had been presented to the husband as a gift. *Id*. at 923. The trial court disregarded this testimony, however, holding that "the only evidence of these gifts were conclusional statements of" the accountant and owner, and that the shares were therefore compensation, not gifts. *Id*. at 925. After reviewing the testimony, the appellate court determined that "the evidence offered by [the husband] was more than conclusory statements." *Id*. at 927. Having dispensed with the trial court's rationale for disregarding the evidence, the court of appeals reviewed the evidence and found, as a matter of law, that it "rebut[ted] by clear and convincing evidence the presumption that the disputed shares were marital property." *Id*. *Johnson* does not, as Husband contends, stand for the proposition that the trial court must always accept evidence so long as it is "more than conclusory."

Finally, Husband argues that there was not substantial evidence supporting a finding that the dog was not a gift to Husband, arguing that Wife's testimony consisted of nothing more than "speculation, conjecture, or surmise," which is not substantial evidence. The argument

11

improperly assumes that a judgment finding that the party bearing the burden did *not* meet its burden must be supported by substantial evidence.

The party attempting to defeat the presumption that property acquired after the marriage is marital must do so by clear and convincing evidence. *Binder*, 186 S.W.3d at 870. If the trial court disbelieves the evidence, or finds it insufficient, then it must rule against the party bearing the burden. There is no requirement that a holding in favor of the non-burden-carrying party be supported by substantial evidence. Rather, if the evidence of the party bearing the burden is not found to be credible, and the other party has offered no evidence, the judgment must be against the party bearing the burden. And "when there are no written findings, the evidence 'shall be considered as having been found in accordance with the result reached;' in other words, in the light most favorable to the judgment." *White*, 321 S.W.3d at 305 (quoting Rule 73.01(c)).

Having found the dog to be marital property, the trial court was tasked with distributing it along with the rest of the property. Neither party requested that the dog be sold and the proceeds distributed, and there is presently no provision for awarding joint custody of animals. So the trial court had to review the equities and award the dog to one of the parties. Wife referred to the dog as her "baby," and testified that she was primarily the person who walked, fed, and cared for the dog, and that, every time she traveled, she brought the dog a treat or toy from her destination. "The circuit court has broad discretion in distributing property, and an appellate court will interfere with the circuit court's judgment only if the division is so unduly weighted in favor of one party as to constitute an abuse of discretion." *Hernandez v. Hernandez*, 249 S.W.3d 885, 888 (Mo. App. W.D. 2008). We discern no abuse of discretion in the award of the dog to Wife.

Husband's first point is denied.

12

*Point II – Debt related to work performed on the marital property*

Husband next disputes both the trial court's finding that there was "no credible evidence to support the claim of" debts incurred while making improvements to the couple's St. Joseph property and its decision not to include the alleged debts, totaling $78,473, in the distribution of assets. Husband argues that he offered substantial evidence in the form of testimony and invoices from the creditors, which Wife did not rebut.

Section 452.330.1 requires that "marital debts" be distributed in the same manner as "marital property." And "'[t]he phrase "marital debts" encompasses all debts incurred during the marriage, either jointly or separately.'" *Gryder v. Gryder*, 129 S.W.3d 467, 471 (Mo. App. S.D. 2004) (quoting *In re Marriage of Pahlow*, 39 S.W.3d 87, 92 (Mo. App. S.D. 2001)).

Husband, as the party alleging the existence of the debt, had the burden of proof on that issue. *Id*. at 472. Therefore, as noted *supra*, even if Wife presented no contradictory evidence, if Husband's evidence was contested, in any way, this Court will affirm a judgment in favor of Wife based solely on the fact that the trial court did not believe Husband's evidence. But here, Wife both contested Husband's evidence, through vigorous cross-examination, and offered, through her own testimony, evidence contradicting Husband's evidence of the existence of the alleged debt.

Woods and Kamler both confirmed that they were good friends with Husband. As to the alleged $55,435 debt to Woods Contracting, Woods could not produce any evidence that work had been done or when it was done, and he stated that, if anything had ever been written down regarding the cost of the project, it would have been written on a "scrap of paper" that he could not produce. Further, Wife testified that Husband had assured her that all of the fill that Woods had brought to their property was from other jobs, that he would have to dispose of it anyway,

13

and that he was bringing it to them "as a favor." The evidence confirmed Wife's belief that the fill would have been disposed of had it not been used on the Englands' property.

Kamler admitted to drinking beer and socializing with Husband while he was at the property allegedly working on a large project and billing the couple nearly $16,000. On cross-examination, Wife also pointed out a number of discrepancies with the dates and amounts of Kamler's invoices, calling into question whether they had been created contemporaneously with any work being performed or with the intent of actually billing for services. Wife also testified that Kamler could not have been working on the property on a number of days that he had claimed in his invoices.

Moreover, even though everyone agreed that Husband had never paid either of these contractors for their services, there is no record of any proceedings to collect these very large debts, other than a single suspicious dunning letter on behalf of each contractor, dated within two weeks of each other and sent many months after both accounts would have become critically delinquent. As Husband's counsel noted at trial, Wife attempted to make it appear that Husband and his friends had "cooked the books." While trial courts certainly should not lightly disregard evidence of legitimate debts, here the trial court could have "reasonably inferred that [Woods and Kamler were] only demanding repayment to give [their friend] an advantage in the dissolution of marriage proceeding." *Panettiere v. Panettiere*, 945 S.W.2d 533, 544 (Mo. App. W.D. 1997).

As to the $6,500 allegedly owed for installation of electricity and lighting in a shed on the couple's property, no one from Leonies Enterprises testified, so this alleged creditor was not subject to the same effective cross-examination as the others. But other than Husband's own testimony, which the court was within its right to disbelieve, Husband provided no evidence that

14

the debt was owed at the time of trial. The only invoice offered was apparently produced at the time that the work was allegedly performed, and contained no notation that any amounts were past due. In light of the scant nature of Husband's evidence of the Leonies Enterprises debt, the other alleged debts that the court found not to be credible, and Wife's testimony that Husband had never told her of any of the debts—which he is now pursuing with such vigor—until two weeks before trial, the trial court could have concluded that the alleged debt to Leonies Enterprises was not credible.

Husband correctly notes that "'[t]he fact that a spouse does not control or participate in the decision to make a particular debt does not preclude allocation of that debt to the non-participating spouse.'" *Pahlow*, 39 S.W.3d at 92 (quoting *Hughes v. Hughes*, 994 S.W.2d 103, 107 (Mo. App. S.D. 1999)). But in assessing the credibility of evidence regarding marital debt, the trial court certainly could have found that, in a marriage where expenses were generally shared equally, it was highly doubtful that Husband would have acquired over $78,000 in debt without Wife's knowledge.

Husband's second point is denied.

### Point III – Husband's motorcycle

Next, Husband challenges the trial court's finding that a Harley Davidson motorcycle, purchased during the marriage, was marital property. As noted *supra*, property acquired by either spouse during the marriage "is presumed to be marital property." § 452.330.3. This presumption may be overcome by clear and convincing evidence that the property was "acquired by gift." § 452.330.2(1); *Binder*, 186 S.W.3d at 870. Husband's evidence that the motorcycle was a gift to him from Mother was vague, at best. Husband testified generally about Mother offering to purchase him an expensive vehicle before the marriage. Rather than accepting that

15

offer, he chose to receive a less expensive vehicle and a motorcycle. Although he received the other vehicle prior to the marriage, he did not receive the motorcycle at that time. In 2003, after his marriage to Wife, Husband purchased a Harley Davidson motorcycle for $22,000. Regarding the purchase, Husband testified merely that he was unemployed at the time and that "unemployed people typically don't have the ability to pay" $22,000 for a motorcycle. Absent was any mention that Mother physically paid for the motorcycle or how such payment was made—whether directly to the dealer or to Husband, either before or after the purchase. Husband's only documentary evidence, a bill of sale, listed Husband as the sole purchaser. Finally, despite being present to testify about the $115,000 gift to Husband and her intent in making such gift (discussed, *supra*), Mother never mentioned the motorcycle in her testimony. Under the circumstances, the trial court was entitled to find that Husband did not meet his burden to prove by clear and convincing evidence that the motorcycle was a gift.

Perhaps because of these evidentiary shortcomings, Husband relies almost entirely on an alleged stipulation by Wife to support his claim that the motorcycle is non-marital property. On direct examination, Wife's counsel asked, "you're asking the Harley be set aside to [Husband] as his sole and separate property[5] . . . for purposes of determining the division of assets and debts and equalization payment?" Wife responded, "Yes." Based on a select portion of this brief exchange, Husband argues that Wife "*stipulated* [that the motorcycle was non-marital property] and *herself* requested the motorcycle be set aside to [Husband] as his separate non-marital property." Wife disagrees with this characterization, arguing that she meant only that she did not wish for the motorcycle to be sold and the proceeds distributed, and that she did not want the motorcycle to be given to her. Rather, while she wanted the motorcycle to be given to Husband,

---

[5] Husband's brief to the Court did not include the second part of the question, instead ending the quotation after the phrase "sole and separate property."

she also wanted the value of the motorcycle to be reflected in the overall marital assets. The record supports Wife's position.

Wife repeatedly referred to items as "non-marital" or "pre-marital" to communicate her wish that they not be included in the overall marital calculation and asked that items be "set aside" to communicate her wish that a party receive the property but that its value be counted for purpose of dividing the marital estate. The trial court similarly used this terminology in its judgment, wherein it repeatedly "set aside" property to one party that was included in the marital total, and declared assets that were not included in the total to be "non-marital." Certainly Husband does not argue, for example, that Wife's business, valued at $62,937, which the trial court "set aside to" Wife but included in the overall value of the marital assets, should now be Wife's non-marital property by virtue of the court's language.

Husband has pointed to no authority supporting his contention that the language used by Wife constitutes a stipulation that assets should be considered non-marital. And we have found none. Moreover, the record supports the trial court's finding that Wife did not so stipulate.

An "appellate court confines itself to determining whether substantial evidence exists to support the trial court's judgment; whether the judgment is against the weight of the evidence—'weight' denoting probative value and not the quantity of evidence; or whether the trial court erroneously declared or misapplied the law." *White*, 321 S.W.3d at 309. And again, clear and convincing evidence was required in order for Husband to prove the existence of a gift. Because the trial court's judgment is not against the weight of the evidence and does not erroneously apply the law, Husband's third point is denied.

*Point IV – Mother's $50,000 gift*

Finally, Husband challenges the trial court's finding that a $50,000 pre-marital gift from Mother to Husband in 2001 was "fully dissipated by [Husband] by the time of the marriage." Husband asks that an additional $50,000 be set aside to him as his non-marital property.

Husband's entire direct testimony related to the gift was that he received it from Mother in 2001, it is presently "in [his] account," and that some "went to [Husband's] education when [he] went back to school" before the marriage. On cross-examination, Husband admitted that he had actually "spent a lot of" it. In other words, Husband admitted that the $50,000 gift was significantly depleted. Yet, inexplicably, Husband seeks a credit for the full $50,000.

Husband bore the burden of proving the remaining value of the gift at the time of the marriage, *see Valentine v. Valentine*, 400 S.W.3d 14, 24-25 (Mo. App. E.D. 2013), and it is unclear from the evidence adduced how the trial court could have determined how much, if any, of the gift from Mother remained in Husband's accounts at that point in time. But any alleged error is irrelevant, because Husband cannot show that he has been prejudiced. In its judgment, the trial court specifically calculated the pre-marital amounts of all accounts and deducted them from the marital estate, awarding to each party as non-marital property the amounts that existed prior to marriage. If, in fact, there was some amount of the gift remaining in Husband's accounts at the time of marriage, he received credit for the full amount. What Husband requests now is an *additional* credit for money that he has already received credit for, and he seeks that credit in an amount greater than could have possibly remained at the time of marriage.

Husband's fourth point is denied.

18

## Conclusion

Having found no error, we affirm the decision of the trial court.

Karen King Mitchell, Judge

Anthony Rex Gabbert, Presiding Judge,
and Joseph M. Ellis, Judge, concur.